**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-0356-22
A-0560-22

JERSEY CITY UNITED AGAINST
THE NEW WARD MAP,
DOWNTOWN COALITION OF
NEIGHBORHOOD ASSOCIATIONS,
GREENVILLE NEIGHBORHOOD
ALLIANCE, FRIENDS OF BERRY
LANE PARK, RIVERVIEW
NEIGHBORHOOD ASSOCIATION,
PERSHING FIELD
NEIGHBORHOOD ASSOCIATION,
SGT. ANTHONY NEIGHBORHOOD
ASSOC., GARDNER AVENUE
BLOCK ASSOCIATION, LINCOLN
PARK NEIGHBORHOOD WATCH,
MORRIS CANAL
REDEVELOPMENT CDC,
HARMON STREET BLOCK
ASSOCIATION, CRESCENT
AVENUE BLOCK ASSOCIATION,
DEMOCRATIC POLITICAL
ALLIANCE, and FRANK E.
GILMORE, in his individual and
official capacity as Ward F
Councilman,

> Plaintiffs-Appellants,

v.

JERSEY CITY WARD COMMISSION
and JOHN MINELLA, in his official
capacity as Chair of the Commission,

| APPROVED FOR PUBLICATION |
| :---: |
| March 12, 2024 |
| APPELLATE DIVISION |

Defendants-Respondents.

_____

JAMES CALDERON,

    Plaintiff-Appellant,

v.

CITY OF JERSEY CITY WARD
COMMISSION, JOHN MINELLA,
Chairman, SEAN J.
GALLAGHER, Secretary, and
Commissioners DANIEL E.
BECKELMAN, PAUL CASTELLI,
JANET LARWA, and DANIEL
MIQUELI,

    Defendants-Respondents.

_____

        Argued November 27, 2023 – Decided March 12, 2024

        Before Judges Gilson, DeAlmeida, and Bishop-Thompson.

        On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket Nos. L-0960-22 and L-0821-22.

        Renée W. Steinhagen argued the cause for appellants in A-0356-22 (New Jersey Appleseed Public Interest Law Center, Inc., Matsikoudis & Fanciullo, LLC, and Yael Bromberg (Bromberg Law LLC), attorneys; Renée W. Steinhagen, Yael Bromberg, and William C. Matsikoudis, on the briefs).

James Calderon, appellant in A-0560-22, argued the cause pro se.

Jason F. Orlando argued the cause for respondents (Murphy Orlando LLC, attorneys; Jason F. Orlando and Tyler Newman, on the briefs).

The opinion of the court was delivered by

GILSON, P.J.A.D.

Following the 2020 decennial United States Census, the City of Jersey City Ward Commission (the Commission) redrew the six election wards for the City of Jersey City (the City). In these two appeals, which we consolidate for purposes of this opinion, plaintiffs challenge the ward boundaries and map adopted by the Commission.

Plaintiffs appeal from orders dismissing their complaints in lieu of prerogative writs, contending that the new ward map violates the Municipal Ward Law (the MW Law), N.J.S.A. 40:44-9 to -18, the New Jersey Civil Rights Act (the CR Act), N.J.S.A. 10:6-1 to -2, and their rights of free speech, free association, and equal protection under the New Jersey Constitution. They also argue that the Commission did not comply with the Open Public Meetings Act (the OPMA), N.J.S.A. 10:4-6 to -21.

Having reviewed these arguments in light of the record and law, we affirm in part and reverse in part. We affirm the dismissal of plaintiffs' claims asserting

violations of their constitutional rights, the CR Act, and the OPMA. We reverse the dismissal of the claims of violations of the MW Law. Resolution of those statutory claims requires some, albeit limited, fact-finding. Thus, we remand the MW Law claims for further proceedings.

I.

The Legislature allows municipalities to adopt a charter or form of government under which a municipality is divided into wards for the purpose of electing members of the municipal governing body. N.J.S.A. 40:44-10. When a municipality adopts that form of government, the MW Law identifies the commissioners who will create the wards and periodically reassess and adjust those wards. See N.J.S.A. 40:44-11, -13. The MW Law provides that the commission shall be composed of the members of the county board of elections and the municipal clerk. N.J.S.A. 40:44-11.

The MW Law also provides that the municipal ward commission "shall" divide the municipality into "compact and contiguous" wards that are roughly equal in population. N.J.S.A. 40:44-14. In that regard, the MW Law states:

> The ward commissioners shall fix and determine the ward boundaries so that each ward is formed of compact and contiguous territory. The population of the most populous ward so created shall not differ from the population of the least populous ward so created by more than [ten percent] of the mean population of the

wards derived by dividing the total population of the municipality by the number of wards created. The most recent [f]ederal decennial census shall be used as the population determinant.

[Ibid.]

Wards must be evaluated and, if necessary, adjusted every ten years based on the federal decennial census. In that regard, the MW Law states:

Within [three] months following the receipt by the Governor of each federal decennial census, the ward commissioners shall meet in the manner provided in subsection a. of this section and proceed to make such adjustments in ward boundaries as shall be necessary to conform them to the requirements of this act.

[N.J.S.A. 40:44-13(c).]

The City is, and has been for decades, divided into six election wards: Wards A, B, C, D, E, and F. In 2020, the United States Census was conducted, and, on September 16, 2021, the Governor promulgated the results. The 2020 Census revealed that Ward E, the largest ward by population in the City, was fifty-nine percent more populous than Ward D, the least populous ward. As of the 2020 Census, Ward E had 69,524 residents, while Ward D had 40,733 residents. Therefore, under the MW Law, the Commission had to redraw the City's ward boundaries and related map.

5

The MW Law required the Commission to hold at least one meeting, which was to be within three months of the receipt of the 2020 Census by the Governor. Ibid. The MW Law also provided that the Commission can hire and be assisted by a surveyor, an engineer, and "other assistants as shall be necessary to aid [the Commission] in the discharge of [its] duties." N.J.S.A. 40:44-12. The Commission was to prepare a report on the boundaries of the wards, together with a map, and the report was to be certified by at least three Commissioners. N.J.S.A. 40:44-15(a). Thereafter, the certified report and map were to be filed with the county clerk, the Secretary of State, and the municipal clerk. Ibid. Finally, the municipal clerk was to cause notice of the ward boundaries to be published in a local newspaper within two weeks of the filing of the Commission's report. N.J.S.A. 40:44-16.

After receiving the 2020 Census, the Commission held three public meetings on December 15, 2021, January 14, 2022, and January 22, 2022. The Commissioners also conducted several working sessions during that time, but the Commissioners certified that no more than three Commissioners were present at any one working session.

On January 22, 2022, after listening to approximately three hours of public comment, the Commission voted to adopt new boundaries for the six wards and

approved a new ward map (the 2022 Ward Map). The ward maps before and after 2022 are depicted in the two maps set forth below:



As these maps reflect, the City is irregularly shaped because its boundaries are based on rivers, harbors, bays, cliffs, and adjoining municipalities. The Commission made various adjustments to the boundaries of the six wards. Those adjustments particularly affected Wards A, E, and F. The shape of Ward F also changed from a somewhat square shape to a jagged, sideways L-shape.

On February 3, 2022, the Commissioners' certified report and 2022 Ward Map were filed with the county clerk, the City's municipal clerk, and the

A-0356-22

Secretary of State. Two days later, on February 5, 2022, notice of the new ward boundaries was published in a local newspaper, The Jersey Journal.

Plaintiffs filed two complaints in lieu of prerogative writs challenging the new ward boundaries and the 2022 Ward Map. The first action was filed on March 7, 2022, by James Calderon, a City resident. Calderon challenged the new wards on two grounds, contending that the Commission had violated (1) the OPMA because the Commissioners had met in private sessions; and (2) the MW Law because the wards, and in particular Wards A and F, were not compact and had broken up the Lafayette neighborhood.

The second action was filed on March 21, 2022, by several community organizations and Frank E. Gilmore, the Ward F Councilperson (collectively, the CO plaintiffs). The CO plaintiffs contended that in redrawing the boundaries of the wards, the Commission "disrupted and carved up long-standing neighborhoods, ignored natural geographic dividers, and even split buildings in half," and thereby "violated basic principles of fair representation and communities of interest" embedded in the statutory requirement that wards be "compact."

The CO plaintiffs' complaint contained four counts. Count one alleged a violation of the MW Law, contending that the wards were not compact, and as

8

a result violated the equal protection provision of the New Jersey Constitution. Count two alleged that the Commissioners had failed to draw the wards compactly, and that failure violated the CO plaintiffs' rights of free speech and association under the New Jersey Constitution. In count three, the CO plaintiffs alleged a violation of the OPMA, contending that the Commission had met and made decisions on the new ward map in private working sessions. Finally, in count four, they alleged that the Commission and its Chairperson had violated the CR Act by depriving the CO plaintiffs of their "rights to reside in . . . ward[s] that consist[] of compact territory that preserves their communities of interest" and their ability to elect representatives of their choice. They also alleged that the Commission had violated the CR Act by retaliating against Gilmore "for his campaign advocacy around affordable housing, gentrification and displacement by removing a significant number of his supporters" from Ward F.

Plaintiffs sought several forms of relief, including (1) a declaration that the 2022 Ward Map and ward boundaries were invalid; (2) an order directing the Commission to redraw the wards more compactly and without splitting neighborhoods or communities of interest unnecessarily; (3) declarations that the Commission violated the OPMA, the CO plaintiffs' rights to free speech and association, and the MW Law; (4) an order "requiring the Commission to make

9

sure that the process is transparent and all meetings of the Commission are open to the public"; and (5) an order awarding plaintiffs legal fees.

In response, the Commission moved under Rule 4:6-2(e) to dismiss the complaints for failure to state valid claims. After hearing oral argument, on August 25, 2022, the trial court issued two orders dismissing both complaints with prejudice. The trial court set forth its reasons on the record.

Concerning the CO plaintiffs' complaint, the trial court initially held that the complaint was filed beyond the forty-five-day time limit for a prerogative writs action. The court determined that the Commission had adopted the new ward boundaries on January 22, 2022, but the CO plaintiffs had waited over fifty days to file their complaint on March 21, 2022.

Nevertheless, the court went on to address the merits of the CO plaintiffs' claims, as well as the claims asserted by Calderon. The court held that plaintiffs failed to adequately plead a violation of the MW Law because the court found that the 2022 Ward Map was compact. The court rejected the CO plaintiffs' equal protection claim, reasoning that the CO plaintiffs based their claim on a "common interest" rather than a protected category as required to sustain an equal protection claim. The court then held that the CO plaintiffs' free speech

and association claims were insufficiently pled because the Commission's actions did not restrict those rights.

Addressing plaintiffs' OPMA claims, the court found that they were deficient because plaintiffs did not identify the dates of any allegedly non-conforming meetings where the Commission took official action. The court also found that the working sessions were not subject to the OPMA because there was no quorum of Commissioners present. Finally, the trial court held that the claim that the Commission retaliated against Gilmore in violation of the CR Act failed as a matter of law because the CO plaintiffs did not allege a violation of a substantive right.

Plaintiffs now appeal from the orders dismissing their complaints in lieu of prerogative writs with prejudice.

## II.

Collectively, plaintiffs make five arguments in these consolidated appeals. They contend that the Commission violated (1) the MW Law; (2) their rights to equal protection; (3) their rights of freedom of speech and association; (4) the OPMA; and (5) their rights under the CR Act. There is also an initial issue concerning the timeliness of the CO plaintiffs' complaint.

11

Appellate courts conduct a de novo review of an order dismissing a complaint under Rule 4:6-2(e). Neuwirth v. State, 476 N.J. Super. 377, 389 (App. Div. 2023). "A reviewing court must examine 'the legal sufficiency of the facts alleged on the face of the complaint,' giving the plaintiff the benefit of 'every reasonable inference of fact.'" Baskin v. P.C. Richard & Son, LLC, 246 N.J. 157, 171 (2021) (quoting Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 107 (2019)). Courts should search the complaint thoroughly "and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary." Ibid. (quoting Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)).

If, however, "the complaint states no claim that supports relief, and discovery will not give rise to such a claim, the action should be dismissed." Ibid. (quoting Dimitrakopoulos, 237 N.J. at 107). Legal sufficiency "requires allegation of all the facts that the cause of action requires." Cornett v. Johnson & Johnson, 414 N.J. Super. 365, 385 (App. Div. 2010), aff'd as modified, 211 N.J. 362 (2012). "In evaluating motions to dismiss, courts consider 'allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim.'" Banco Popular N. Am. v. Gandi,

184 N.J. 161, 183 (2005) (quoting Lum v. Bank of Am., 361 F.3d 217, 221 n.3 (3d Cir. 2004)). "If the court considers evidence beyond the pleadings in a Rule 4:6-2(e) motion, that motion becomes a motion for summary judgment, and the court applies the standard of Rule 4:46." Dimitrakopoulos, 237 N.J. at 107.

A.     The Timeliness of the CO Plaintiffs' Complaint.

Rule 4:69-6(a) states that "actions in lieu of prerogative writs must be commenced no later than '[forty-five] days after the accrual of the right to the review, hearing or relief claimed.'" Save Camden Pub. Schs. v. Camden City Bd. of Educ., 454 N.J. Super. 478, 489 (App. Div. 2018) (alteration in original) (quoting R. 4:69-6(a)). Where the forty-five-day mark falls on a Saturday, Sunday, or legal holiday, the period is extended until the next business day. See R. 1:3-1. Courts may extend the time "where it is manifest that the interest of justice so requires." R. 4:69-6(c). In short, this rule is "aimed at those who slumber on their rights." Hopewell Valley Citizens' Grp., Inc. v. Berwind Prop. Grp. Dev. Co., 204 N.J. 569, 579 (2011) (emphasis omitted) (quoting Schack v. Trimble, 28 N.J. 40, 49 (1958)).

Rule 4:69-6(a) does not define when actions in lieu of prerogative writs for ward commission actions accrue. The MW Law also does not specify when the right to review an action by a ward commission accrues. Therefore, we look

13

to substantive law on when an action accrues.  See Harrison Redevelopment Agency v. DeRose, 398 N.J. Super. 361, 401 (App. Div. 2008).  Substantive law establishes that an action in lieu of prerogative writs challenging an action of a municipal government accrues on the date the action is adopted.  See In re Borough of Englewood Cliffs, 473 N.J. Super. 189, 205 (App. Div. 2022) (holding that the right to challenge the Borough Council's approval of a settlement agreement accrued on the date the Council voted to approve the agreement, where no further action was required for approval).

When a ward commission adjusts boundaries following the receipt of a federal decennial census, the commissioners are to meet, take an oath, and then "make such adjustments in ward boundaries as shall be necessary to conform them to the requirements of this act."  N.J.S.A. 40:44-13(c).  Thereafter, within thirty days, the ward commissioners shall file their report "setting forth and properly describing the ward boundaries fixed and determined."  N.J.S.A. 40:44-15(a).  The certified report is then to be filed with the county clerk, the Secretary of State, and the municipal clerk.  Ibid.  These provisions support the interpretation that the Commission's actions are adopted when the report is filed.

The Commission's report was filed on February 3, 2022.  The CO plaintiffs filed their complaint in lieu of prerogative writs on March 21, 2022.

A-0356-22

Forty-five days from February 3, 2022, was Sunday, March 20, 2022. Thus, the filing on March 21, 2022 was timely. Moreover, because the adoption of the new ward boundaries and ward map is an issue of broad public concern, it would have been in the interest of justice to extend the time to consider the CO plaintiffs' complaint in lieu of prerogative writs. Indeed, it would have been particularly appropriate in this matter to relax the forty-five-day requirement because the complaint by Calderon was timely, and the court was going to consider his claims on the merits. Thus, we reject the trial court's holding that the complaint filed by the CO plaintiffs was untimely and we, accordingly, consider all the claims on their merits.

B.    The MW Law Claims.

The MW Law "shall constitute the exclusive method whereby the boundaries of wards, or other similar representation districts, in municipalities shall be fixed and determined." N.J.S.A. 40:44-10. It sets forth three requirements for ward districts. N.J.S.A. 40:44-14. Each ward must be (1) "compact" and (2) "contiguous," and (3) "[t]he population of the most populous ward . . . shall not differ from the population of the least populous ward . . . by more than [ten percent] of the mean population of the wards." Ibid. The third requirement is designed to maintain a roughly equal population distribution

15

among the wards and has the goal of protecting the one-person, one-vote principle. See Davenport v. Apportionment Comm'n, 65 N.J. 125, 129 (1974) (explaining that the goal of substantial equality of population among legislative districts was "the overriding object of the one-[person], one-vote principle").

Initially, it is important to delineate what these appeals do not involve. There is no claim of invidious discrimination. Moreover, plaintiffs have not alleged gerrymandering based on political party. Instead, they have made broad allegations about the fragmentation of "communities of interest" and neighborhoods. Those allegations, however, do not support a claim that the wards were shaped for partisan advantage that "will not be tolerated." Id. at 134.

Plaintiffs also do not challenge the 2022 Ward Map and the ward boundaries on the grounds that the wards are not contiguous. Indeed, a review of the 2022 Ward Map establishes that each ward is contiguous because none of the wards are broken into more than one area.

Instead, plaintiffs contend that the wards are not compact. The Legislature did not define "compact" in the MW Law. Moreover, there are no published decisions interpreting the MW Law or its use of the word "compact." Accordingly, we look to the plain meaning of the word "compact" and construe

16

it within the context and purpose of the entire MW Law. See State v. Thompson, 250 N.J. 556, 572 (2022).

The definition of "compact" includes "having a dense structure or parts or units closely packed or joined" and "occupying a small volume by reason of efficient use of space." Merriam-Webster's Collegiate Dictionary 252 (11th ed. 2020). To give meaning to this definition as applied to a municipal ward, we look to cases evaluating challenges to State legislative reapportionments and congressional redistricting in New Jersey. See Steinhardt v. N.J. Redistricting Comm'n (In re Establishment of Cong. Dists.), 249 N.J. 561 (2022); Davenport, 65 N.J. 125.[1]

It is fair to presume that in enacting the MW Law, the Legislature considered how State legislative and congressional districts are reapportioned and the law governing the scope of judicial review. In doing so, however, we recognize a fundamental distinction between municipal wards and State legislative or congressional districts. State legislative and congressional districts are created by and defined in the New Jersey Constitution. N.J. Const.

---

[1] Plaintiffs cite to cases from other jurisdictions and urge us to consider how those courts have evaluated challenges to redistricting plans. We find those cases to be of limited use in these appeals because we are construing the MW Law, a New Jersey statute.

art. IV, § 3, ¶ 1; N.J. Const. art. II, § 2, ¶ 1.  In contrast, municipal wards are created by and defined by the MW Law—a statute.

Our Supreme Court has long recognized that "[c]ompactness is an elusive concept" and "may be of limited utility in creating legislative districts in light of the odd configuration of our State and its municipalities."  Davenport, 65 N.J. at 133.  Moreover, in considering challenges to the State legislative and congressional reapportionment and redistricting plans, our Supreme Court has held that courts have a "limited" role.  Id. at 135.  The Court has recognized that "[p]olitics and political considerations are inseparable from districting and apportionment."  Id. at 134 (quoting Gaffney v. Cummings, 412 U.S. 735, 753 (1973)).  Thus, the Court has explained:

> Reapportionment is essentially a political and legislative process.  The plan must be accorded a presumption of legality with judicial intervention warranted only if some positive showing of invidious discrimination or other constitutional deficiency is made.  The judiciary is not justified in striking down a plan, otherwise valid, because a "better" one, in its opinion, could be drawn.
>
> [Id. at 135 (quoting Gaffney, 412 U.S. at 751).]

Recognizing that the Constitution governs State legislative and congressional districts, the Court has also held that commissions that adopt redistricting or reapportionment plans are not subject to the normal arbitrary,

capricious, and unreasonable standard generally used to evaluate agency actions. In re Establishment of Cong. Dists., 249 N.J. at 576-77. Instead, courts are limited to determining whether the redistricting plan is "unlawful or reflects invidious discrimination." Id. at 574.

Applying these principles to municipal wards, we hold that two rules govern a court's limited review of a commission's adjustment of wards when there is no claim of invidious discrimination or partisan gerrymandering. First, the boundaries and map can only be challenged on the basis that they violate any of the three MW Law requirements of compactness, contiguousness, or population deviation. Challenges based on general, but undefined, concepts of "communities of interest" or "historic neighborhoods" are not viable. While communities of interest and neighborhoods are clearly important, the Legislature did not include those considerations in the MW Law.

Second, the role of a court in reviewing compactness is limited. A ward need not be as tight as possible, and the realities of geography will require some amount of elongation and jagged boundaries. A ward need only have a rational basis for its shape, considered within the context of the shape of the overall municipality, the other wards, and the population deviation between the most

populous and least populous wards. The court should not consider whether there is a better or more compact configuration.

Applying these rules to the 2022 Ward Map and the ward boundaries, we reverse for a very limited fact-finding. On a motion to dismiss, and without any factual record, the trial court in these matters simply concluded that the wards were compact. The court needed to conduct some proceeding focused on the question of whether there was a rational basis for the Commission's configuration of the wards. That proceeding, however, should be limited. Given the allegations in plaintiffs' complaints, they are not entitled to discovery, and the fact-finding proceedings should be carefully restricted. The inquiry is simply to determine if the Commissioners had a rational basis for their configuration, so the court can then determine whether the wards are compact, given the flexibility afforded by the MW Law. The trial court will have discretion to allow focused cross-examination of one or more Commissioners, provided that examination is limited to the rational basis for the compactness of the wards. Moreover, plaintiffs cannot challenge the Commission's configuration by arguing that the wards do not comply with other models of compactness. In that regard, we expressly reject the CO plaintiffs' attempt to use the Polsby-Popper Measure or the Reock Measure. Plaintiffs should also

not be allowed to challenge the 2022 Ward Map based on whether it breaks up communities of interest or neighborhoods.

C.    The CO Plaintiffs' Constitutional Claims.

The CO plaintiffs allege that the Commission's failure to draw compact wards violated their New Jersey constitutional rights of equal protection, free speech, and free association.  However, the CO plaintiffs' allegations, even when given every reasonable inference, fail to state viable constitutional claims.

The principle of equal protection is derived from Article I, Paragraph 1 of the New Jersey Constitution, which states:

> All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

See also State v. Pimentel, 461 N.J. Super. 468, 490 (App. Div. 2019) (recognizing that the principle of equal protection under the New Jersey Constitution derives from this article).

To state an equal protection claim, a claimant must show that the challenged governmental action does not apply "evenhandedly to similarly situated people."  Caviglia v. Royal Tours of Am., 178 N.J. 460, 472 (2004) (recognizing that a governmental action is invalid on equal protection grounds

when it does not apply "evenhandedly to similarly situated people"); Greenberg v. Kimmelman, 99 N.J. 552, 568 (1985) (explaining that Article I, Paragraph 1 protects "against the unequal treatment of those who should be treated alike"); see also Lewis v. Harris, 188 N.J. 415, 443 (2006) (recognizing that an equal protection challenge to a governmental action must be based on the contention that the action does not apply "evenhandedly to similarly situated people").

In their complaint, the CO plaintiffs allege that the Commission's failure to draw compact wards led to "the unnecessary splitting of neighborhoods and other communities of interest" into different wards, resulting in a violation of the CO plaintiffs' equal protection rights as guaranteed by the New Jersey Constitution. They point to the splitting of the Lafayette neighborhood, which, according to them, "comprises one [of] the oldest African-American communities in the State of New Jersey." As already pointed out, however, the CO plaintiffs acknowledge that the Commission did not engage in any form of invidious discrimination, including discrimination based on race, in redrawing the City wards.

More fundamentally, the CO plaintiffs' complaint has not identified how any class of people was treated differently by the Commission as compared to another class of people. The CO plaintiffs allege that some residents of the City

were moved to different wards. That, however, is exactly what the MW Law authorizes. Indeed, the CO plaintiffs are not contending that there should be no wards; rather, they are objecting to how the Commission adjusted the wards. Even giving the CO plaintiffs every reasonable inference, their complaint simply does not state a viable equal protection claim.

For similar reasons, the CO plaintiffs' claims of violations of their free speech and association rights also fail. In protecting free speech, the New Jersey Constitution declares: "Every person may freely speak, write and publish his [or her] sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." N.J. Const. art. I, ¶ 6. Addressing the right of free association, the New Jersey Constitution states: "The people have the right freely to assemble together, to consult for the common good, to make known their opinions to their representatives, and to petition for redress of grievances." N.J. Const. art. I, ¶ 18.

In their complaint, the CO plaintiffs allege that "the Commission's [2022 Ward] Map amounts to an attempt to nullify the end-product of the democratic election process." They assert that the voters in Ward F elected Gilmore as their councilperson because of his advocacy for affordable housing and opposition to

the City's increasing development of luxury high-rises. They then contend that the Commission "tore apart large blocks of voters, split[ting] neighborhoods that were instrumental in electing" Gilmore. They argue that the new ward map thereby infringes on their rights to free speech and assembly by depriving them of the right to "elect the candidate of their choice."

The wards created by the Commission, however, did not impact the CO plaintiffs' rights of free speech and association. The CO plaintiffs have the same free speech and association rights they had before the wards were adjusted in 2022. They are all residents of the City, and ward boundaries do not infringe on their rights of free speech and association. While purposely diluting the votes of certain identifiable groups might infringe on a constitutional right to assemble, there is no showing that the Commission engaged in that kind of diluting. The MW Law expressly states that when wards are redrawn, incumbent councilpersons are not removed from their elected positions. N.J.S.A. 40:44-17. Thus, it is pure speculation as to whether Gilmore will retain his position as councilperson for Ward F at the next election.

More fundamentally, all residents of the City, including the CO plaintiffs, will continue to have the same free speech and association rights to support or oppose the re-election of Gilmore. While some residents who were formerly

part of Ward F may not be able to directly vote for Gilmore, they can exercise their rights of free speech and association to support candidates of their choice in their new wards. In short, creating and adjusting wards necessitates that residents of the City will be divided into different wards. Moreover, when wards need to be adjusted to maintain substantial population equality, some residents will have to be moved to different wards.

D.     The OPMA Claims.

Plaintiffs argue that the Commission violated the OPMA by holding unannounced private meetings. They contend that at those meetings, the Commissioners (1) "drafted proposals for various maps[;]" (2) discussed considerations related to these maps; (3) used mapping software to compare "existing ward boundaries with census block data[;]" (4) discussed the extent to which each map would "impose the least amount of demographic change to each ward" and "lowering the deviation between the most populous ward and the least populous to the lowest possible percentage[;]" and (5) selected a map to present to the public, thereby deciding to exclude the presentation of the other maps they were considering from the public. Plaintiffs also assert that these private meetings "were open to all members of the Commission" and "were attended by an effective majority."

25

Plaintiffs' allegations failed to state a viable OPMA violation. The Commissioners certified that all non-public working sessions involved less than a quorum of the Commissioners. Although consideration of those certifications effectively converted the motion to dismiss into a motion for summary judgment on the OPMA claims, the Commission was still entitled to a dismissal of those claims.

The MW Law contemplates that ward commissioners will engage in working, non-public meetings. See N.J.S.A. 40:44-12 (allowing the commissioners to retain and consult with a surveyor, an engineer, or "other assistants as shall be necessary to aid them in the discharge of their duties"). Plaintiffs should not be permitted to take discovery concerning the non-public meetings in an effort to try to support an OPMA claim, because that discovery would invade the province of the Commissioners. The Commissioners' obligations were to discharge their duties under the MW Law and adopt ward boundaries and a map in accordance with the MW Law. See N.J.S.A. 40:44-13, -15. The OPMA does not prohibit individual commissioners or a group of commissioners, constituting less than a quorum, from meeting with "assistants" and considering information, including alternative maps, in private meetings.

Additionally, plaintiffs cannot show that the Commission took any formal action in a non-public meeting. There is no dispute that the Commission voted to adopt new ward boundaries and a new map at the January 22, 2022 public meeting. Adopting new boundaries and a map are the only actions required of the Commissioners under the MW Law. In short, plaintiffs have not alleged, nor could they allege, viable OPMA claims.

E.    The CO Plaintiffs' CR Act Claims.

The CR Act provides that "[a]ny person who has been deprived of . . . any substantive rights, privileges or immunities secured by the Constitution or the laws of this State . . . by a person acting under color of law" may bring an action for damages. N.J.S.A. 10:6-2(c); see also Winberry Realty P'ship v. Borough of Rutherford, 247 N.J. 165, 183 (2021). Accordingly, plaintiffs must show (1) a substantive right conferred by a law or the Constitution; (2) a deprivation of that right; and (3) that the deprivation was made by a person acting under color of law. See Winberry Realty P'ship, 247 N.J. at 183-84.

The CO plaintiffs allege that the Commission's adoption of the new ward boundaries and map violated their rights under the CR Act in two respects. First, they contend that the Commission infringed on their constitutional rights of equal protection, freedom of speech, and freedom of association. For the

reasons that have already been explained, those constitutional claims fail and, therefore, they also do not support viable claims under the CR Act.  See AmeriCare Emergency Med. Servs. v. City of Orange Twp., 463 N.J. Super. 562, 574 (App. Div. 2020) (explaining that a CR Act claim is viable only where someone acting under color of law has deprived the plaintiff of a right or has interfered with the plaintiff's enjoyment or exercise of a right); Hurdleston v. New Century Fin. Servs., 629 F. Supp. 2d 434, 443 (D.N.J. 2009) (explaining that because the plaintiff had not shown deprivation of a substantive right, the defendants were entitled to summary judgment on the plaintiff's CR Act claim).

The CO plaintiffs also allege that the Commission retaliated against Gilmore in adopting the new ward boundaries.  They alleged that the retaliation took the form of moving certain residents who had voted for Gilmore out of Ward F and removing federal opportunity zones and proposed or approved development projects from Ward F.  As already discussed, this claim is speculative and does not rise to the level of a substantive right, privilege, or immunity secured by the Constitution or the laws of New Jersey.  Accordingly, this claim was also properly dismissed.

A-0356-22

F.     Conclusion.

In summary, we affirm the dismissal of plaintiffs' constitutional claims and their claims under the OPMA and the CR Act.  We reverse and remand the claims under the MW Law for a focused and limited proceeding on whether the Commission had a rational basis for the ward boundaries and map it adopted. That rational basis may well be set forth in the Commission's report.  If so, the Commissioners can certify that rational basis, and the trial court can then determine if that is sufficient.  On the current record, plaintiffs are not entitled to discovery from or depositions of the Commissioners.

Affirmed in part, reversed in part, and remanded in accordance with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0356-22